1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                    NORTHERN DISTRICT OF CALIFORNIA

10

11    JOSE R. ORTIZ-CALDERON,                 Case No.  15-02238 EJD (PR)

                        Petitioner,
12                                            **ORDER DENYING PETITION FOR
                                              WRIT OF HABEAS CORPUS;**
13         v.                                 **DENYING CERTIFICATE OF
                                              APPEALABILITY; DIRECTIONS TO
14    T. HOLT, Warden,                         CLERK**

15                        Respondent.

16

17

18         Petitioner has filed a <u>pro se</u> petition for a writ of habeas corpus under 28 U.S.C. § 2254

19    challenging his state conviction.  Respondent filed an answer on the merits.  Petitioner did not file

20    a traverse although given an opportunity to do so.  For the reasons set forth below, the Petition for

21    a Writ of Habeas Corpus is **DENIED**.

22

23                              **I.  BACKGROUND**

24         In 2013, Petitioner was charged in Sonoma County Superior Court with the following

25    violations of the California Penal Code: two counts of forcible sexual penetration (§ 289(a)(1))

26    (counts 1 and 2); assault by means of force likely to produce great bodily injury (§ 245(a)(1))

27    (count 3); and felony false imprisonment (§ 236) (count 4).  (Ans. at 1.)  Petitioner was convicted

28    by a jury of all counts except count 2.  Petitioner was sentenced to six years in state prison.  (<u>Id.</u>)

*United States District Court*
*Northern District of California*

1    The California Court of Appeal affirmed the judgment on January 20, 2015. (Ex. 7.) On

2    April 15, 2015, the state high court summarily denied review. (Ex. 9.)

3        Petitioner filed the instant habeas petition on May 19, 2015.

4

5                            **II. STATEMENT OF FACTS**

6        The following facts are taken from the opinion of the California Court of Appeal on direct

7    appeal[1]:

8            In late June 2011, defendant and Megan Differding [FN2] had been dating
9        for about three months. They lived a few houses down the street from each other.

10          FN2. Differding was originally identified as Jane Doe in the information.
11      She later expressly requested that she be referred to by her given name, as
        reflected in the Amended Information.

12          Differding spent the evening of June 22, 2011, with defendant, first at his
13      house, where they watched television and smoked marijuana, and then at the
        home of one of defendant's friends, where Differding drank a 24-ounce bottle of
14      beer and smoked more marijuana. Defendant drank beer.

15      Differding's Testimony

16          Differding and defendant returned to defendant's house around 2:00 a.m.
17      Differding wanted to go back to her own home to sleep because she had to work
        the next day. Defendant became angry with her and accused her of sleeping with
18      other men. They argued, and defendant insisted on keeping Differding's car keys
        and cell phone so she could not use them to go out with another man that evening.
19      Differding left her keys and cell phone behind and walked home.

20          About 8:00 a.m. that morning, Differding walked back to defendant's
21      house to retrieve her belongings. A man she did not know opened the door and
        let her in. She went into defendant's bedroom, where he again accused her of
22      going out with another man. They continued arguing, and defendant refused to
        return her cell phone and car keys. She started to cry and went into the bathroom
23      to get away from defendant and for some privacy.

24          Defendant entered the bathroom "in a rage." He screamed insults at her,
25      calling her a "slut," a "whore," and "bitch." He slapped her face repeatedly and
        pushed her to the floor. She yelled at him to stop, but he lay on top of her and
26      pinned her down. He reached inside her shorts and "shov[ed]" his fingers so far

27  _____

28  [1]This summary is presumed correct. <u>Hernandez v. Small</u>, 282 F.3d 1132, 1135 n.1 (9th Cir.
    2002); 28 U.S.C. § 2254(e)(1).

United States District Court
Northern District of California

into her vagina that it "felt like [they were] in [her] stomach." She could tell it was more than one finger "[b]ecause it hurt so bad." He withdrew his fingers after a few seconds and held his hand up to her face, ordering her to smell his fingers. He slapped her face again.

Differding testified that she was eventually able to get up, but defendant pushed her again. She fell backwards into the bathtub and hit her head on the faucet, which caused the water to turn on. She struggled to stand up, and defendant pinned her against the wall with his arm across her throat. Differding resisted, but defendant pulled off her shorts and then ripped her underwear. She was having trouble breathing because of the pressure against her throat. While he had her pinned against the wall with his forearm across her neck, defendant again pushed his fingers into her vagina. Differding was screaming, "'Stop, stop, stop, stop,'" and he "finally stopped." She was on the bathroom floor, trying to protect herself, and he was standing over her, breathing hard, as though "he was so tired he couldn't hit me anymore, or struggle with me."

Differding grabbed her keys and phone, ran out the front door, and drove her car, which had been parked in front of defendant's house, back over to her house. She told her mother defendant had beaten her up. Differding threw up in the sink and had to lie down because her head and neck hurt so badly. Differding's mother called the police.

Differding testified that it hurt to go the bathroom for about a week, and that her entire upper body was sore for several months. She lost her job because she could not lift anything weighing more than 10 pounds.

On cross-examination, Differding acknowledged that she testified she had nothing to drink at defendant's friend's house when, in fact, she drank a 24-ounce bottle of beer. She also acknowledged that she had used cocaine some 30 hours before the assault. Differding admitted that she had given conflicting statements as to the number of times that defendant had penetrated her vagina with his fingers. Shortly after the incident, she told a sheriff's deputy she had been penetrated two or three times. At the preliminary hearing, she first estimated three or four times, and later stated, "'[p]robably more than five times.'"

Differding also admitted that in 2005, when she was in the eighth grade, she told her mother that she had been kidnapped by two men, but that this was a lie; she "had ditched school that day" and did not want to get in trouble. When the police questioned [] her about the allegation at the time, she admitted she had not been kidnapped.

Differding also acknowledged that she stole a bottle of tequila from a market in September 2012.

///
///
///

3

Other Prosecution Witnesses

Differding's mother, Gayle Differding, testified that Differding seemed irritated about having to pick up her keys and cell phone at defendant's house on the morning of the incident.  When Differding returned home a short time later, she was crying hysterically and her clothes were wet.  She told her mother, "'He beat me up.'"  Gayle Differding called 911.  She could hear her daughter vomiting in the bathroom, and she later saw vomit in the toilet bowl.  She heard her daughter tell paramedics that defendant "had pushed her into the bathtub, and that he had held her down, that he had pushed her shorts aside, and had rammed his hand up her vagina."

Sonoma County Sheriff's Deputy Blake Hulquist testified that Differding was bleeding from the mouth, had injuries to her chest, and was crying and hyperventilating when he arrived at the house in response to a dispatch call.

Deputy Tim Rountree testified that he spoke with Differding while the paramedics were getting her ready to be taken to the hospital.  Differding told Rountree that defendant had taken her keys the night before because he suspected her of sleeping with other men.  Differding went back to defendant's house earlier that morning to get her keys, and defendant attacked her in the bathroom.  She told Deputy Rountree that defendant slapped her, then pushed her into the bathroom, ripped off her shorts, and inserted his fingers into her vagina.  He smelled his fingers and "asked her who she had been fucking."  Differding said defendant "smashed her head into the bathtub, and again assaulted her, slapped her some more."

A firefighter paramedic who responded to the scene testified that Differding was crying and upset.  She told him that she had been assaulted by her boyfriend.  She said defendant struck her in the head and pushed her down, and she hit her head and neck in the bathtub.  She also "reported that he ripped off her underwear and stuck his fingers into her vagina."  Differding complained of back and neck pain from having hit her head during the fall.  She was taken by ambulance to the hospital.  En route, her blood pressure was elevated and the paramedic administered morphine for pain.

Differding was examined by an emergency room physician and a sexual assault response team (SART) nurse.  She complained of hoarseness and pain to her head, neck, throat, arm, and vaginal area.  A CAT scan and x-rays revealed no broken bones or serious injuries, but there was bruising to her throat, voice box, and thyroid cartilage, and nerve injury to her arm.  The examining doctor opined that her symptoms were "anatomically consistent" with her description of what had happened; it "made sense physiologically."

The SART nurse saw multiple bruises on Differding's neck and arms, a two-inch abrasion on the back of her leg, and "a pretty significant abrasion" on her scalp.  The nurse also saw signs of trauma to Differding's vaginal region that were consistent with repeated penetration by a hard object.  The nurse noted a laceration with abrasion, torn skin, and petechiae (bleeding underneath the skin)

4

on the left and right labia minora.  The nurse could not say whether Differding's vaginal injuries were the result of consensual or non-consensual sexual activity.  (Differding testified that she and defendant had consensual sexual intercourse while dating; the most recent time before the assault might have been two nights earlier.)

Defendant's Arrest and Statement to Law Enforcement

After speaking with Differding, Deputy Hulquist walked to defendant's house.  Defendant was not there.  While searching the house, Hulquist saw women's underwear in a trash can in the bathroom.  Hulquist waited outside the front of the house for a couple of hours.  He went back inside the house when he heard some dogs barking in the back, and caught a glimpse of defendant entering a bedroom and going into a closet.  Hulquist opened the closet door and found defendant.  After a brief struggle, Hulquist arrested him.

Sheriff's Detective Matthew North questioned defendant later that day.  The interview was videotaped.  After reading defendant his *Miranda* [FN3] rights and obtaining his waiver, Defendant North asked defendant if he had "any idea why you're here?"  Defendant responded, "Yeah, I'm pretty sure I do."  Defendant told North that he and Differding had been out drinking the night before and got back around 3:30 a.m.  He took her keys so she would not drive while drunk.  Differding left defendant's house and returned around 7:00 a.m. to get her car keys.  Defendant said he was still "really drunk," and they got into an argument in the bathroom.  She started calling him names and he "flipped out" and "overreacted."  Defendant was upset because he suspected Differding was having sex with other people.  Defendant admitted pulling off Differding's underwear, saying it happened when she fell in the bathtub.  He repeatedly admitted penetrating her vagina, and admitted at one point that he knew it was wrong.  He also repeatedly stated that he was drunk at the time.  Several times during the interview, defendant claimed that he grabbed Differding accidentally when one or both of them slipped on the wet bathroom floor.

FN3. *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

Both Detective North and the deputy who collected evidence from under defendant's fingernails noticed scratches and some redness on defendant's face and arms.  DNA analysis of scrapings form under defendant's fingernails showed Differding's DNA.  A blood sample from defendant tested negative for alcohol.

Defense Witnesses

Clifton Jordan, a friend of defendant's brother Juan, testified that he spent the night of June 22, 2011, on the couch at defendant's house.  Jordan let Differding into the house the next morning, and she and defendant immediately started arguing in Spanish.  They went into defendant's room and Jordan could hear them arguing.  It sounded like a typical "petty argument."  He heard doors opening and slamming, and heard Differding say, "stop."  He went to the closed bathroom door and "asked if everything was okay."  Defendant and Differding

both became quiet and defendant answered, "'Everything's fine. Don't worry about it.'" Shortly thereafter, Jordan went out on the back porch to smoke a cigarette and heard the front door close. When he came back inside, defendant was in the living room and Differding was gone. A short time later, defendant left the house. The police arrived a few minutes later.

A Department of Justice criminalist testified that Differding's June 23, 2011, urine sample tested positive for marijuana, cocaine and a cocaine metabolite, and Vicodin/hydrocodone. The presence of cocaine itself strongly suggested that Differding had ingested cocaine within 12 hours, and not more than 24 hours, of giving the urine sample.

The Verdict and Sentence

On February 26, 2013, a jury found defendant guilty on counts 1 (forcible sexual penetration), 3 (assault by means of force likely to produce great bodily injury) and 4 (false imprisonment), and not guilty on count 2 (forcible sexual penetration).

The trial court sentenced defendant to an aggregate term of six years in state prison, comprising the middle term of six years for count 1 as the base term, and middle terms of three years for count 3 and two years for count 4 (false imprisonment) to run concurrently.

Defendant filed a timely notice of appeal.

People v. Ortiz-Calderon, No. A138987, slip op. at 2-8 (Cal. Ct. App. Jan. 20, 2015) (hereinafter "Op.").

## III. DISCUSSION

### A.    Standard of Review

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975). The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted

United States District Court
Northern District of California

6

in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision.  Williams, 529 U.S. at 412; Brewer v. Hall, 378 F.3d 952, 955 (9th Cir. 2004).  While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied.  Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir.), overruled on other grounds by Lockyer v. Andrade, 538 U.S. 63 (2003).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case."  Williams, 529 U.S. at 413.  "Under § 2254(d)(1)'s 'unreasonable application' clause, . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  Id. at 411.  A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable."  Id. at 409.  The federal habeas court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

Here, as noted, the California Supreme Court summarily denied Petitioner's petitions for review.  (See Ex. 9.)  The California Court of Appeal, in its opinion on direct review, addressed the claims Petitioner raises in the instant petition.  (See Ex. 7.)  The Court of Appeal thus was the highest court to have reviewed those claims in a reasoned decision, and, as to those claims, it is the

Court of Appeal's decision that this Court reviews herein.  See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005).

The Supreme Court has vigorously and repeatedly affirmed that under AEDPA, there is a heightened level of deference a federal habeas court must give to state court decisions.  See Hardy v. Cross, 132 S. Ct. 490, 491 (2011) (per curiam); Harrington v. Richter, 131 S. Ct. 770, 783-85 (2011); Felkner v. Jackson, 131 S. Ct. 1305 (2011) (per curiam).  As the Court explained:  "[o]n federal habeas review, AEDPA 'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'"  Id. at 1307 (citation omitted).  With these principles in mind regarding the standard and limited scope of review in which this Court may engage in federal habeas proceedings, the Court addresses Petitioner's claims.

**B**.  **Claims and Analysis**

Petitioner asserts the following grounds for relief: (1) the trial court improperly denied his requested jury instruction regarding the specific intent element of forcible sexual penetration, (Pet. at 3); (2) the appellate court erred in denying his claims of instructional error because it applied the incorrect standard of review, (id. at 3 and 5); (3) the trial court improperly instructed the jury that according to CALCRIM 1045 the intent to sexually "abuse" under section 289 of the California Penal Code may be satisfied by the intent to cause mere "discomfort," (id., at 5); (4) the trial court improperly instructed the jury with CALCRIM 372 which "conflicts with the statute authorizing instruction regarding flight," (id.); (5) cumulative error; and (6) insufficient evidence to support the conviction for felony false imprisonment, (id. at 5-6).

**1.**   **Instructional Errors (Claims 1, 2, 3, 4, and 5)**

Petitioner's claims 1 through 5 involve alleged errors in jury instructions.  To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. See Estelle v. McGuire, 502 U.S. 62, 78 (1991); Cupp v. Naughten, 414 U.S. 141, 147 (1973); see also Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous or even 'universally condemned,' but that it violated

United States District Court
Northern District of California

some [constitutional right].'"").  The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record.  See Estelle, 502 U.S. at 72.  In other words, the court must evaluate jury instructions in the context of the overall charge to the jury and as a component of the entire trial process.  United States v. Frady, 456 U.S. 152, 169 (1982) (citing Henderson v. Kibbe, 431 U.S. 145, 154 (1977)); Prantil v. California, 843 F.2d 314, 317 (9th Cir. 1988); see, e.g., Middleton v. McNeil, 541 U.S. 433, 434-35 (2004) (per curiam) (no reasonable likelihood that jury misled by single contrary instruction on imperfect self-defense defining "imminent peril" where three other instructions correctly stated the law).

The relevant inquiry is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a manner that prevents the consideration of constitutionally relevant evidence." Boyde v. California, 494 U.S. 370, 380 (1990).  A determination that there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution establishes only that an error has occurred.  See Calderon v. Coleman, 525 U.S. 141, 146 (1998).  If an error is found, the Court also must then determine that the error had a substantial and injurious effect or influence in determining the jury's verdict, see Brecht v. Abrahamson, 507 U.S. 619, 637 (1993), before granting relief in habeas proceedings.  See Calderon, 525 U.S. at 146-47.

### a.   Denial of Proposed Instruction on Specific Intent (Claim 1)

Petitioner's first claim is that the trial court improperly denied his requested jury instructions regarding the specific intent element of forcible sexual penetration, which deprived him of the right to a jury determination of every element of the offense.

The California Court of Appeal reviewed the applicable law for reviewing claims of instructional error:

> We apply the de novo standard of review to claims of instructional error. (*People v. Manriquez* (2005) 37 Cal.4th 547, 581; *People v. Posey* (2004) 32 Cal.4th 193, 218.)  "'[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.  [Citations.]…. "The absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole."  [Citation.]'  [Citation.]"  (*People v. Bolin* (1998) 18 Cal.4th 297, 328.)  "Jurors are presumed able to understand and correlate

9

instructions and are further presumed to have followed the court's instructions."
(*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)  A claim that the jury was
incorrectly or incompletely instructed required the reviewing court to determine
from the entire charge whether there is a reasonable likelihood that the jury
misconstrued or misapplied the instruction.  (*People v. Letner* (2010) 50 Cal.4th
99, 192.)  "'Instructions should be interpreted, if possible, to as to support the
judgment rather than defeat it if they are reasonably susceptible to such
interpretation.' [Citation.]" (*People v. Ramos* (2008) 163 Cal.App.4th 1082,
1088.)

Further, we examine the jury instructions as a whole, in light of the trial
record, to determine whether it is reasonably likely the jury understood the
challenged instruction in a way that undermined the presumption of innocence or
tended to light the prosecution's burden of proving each element of each offense
beyond a reasonably doubt.  (See *People v. Frye* (1998) 18 Cal.4th 894, 958,
overruled on other grounds in *People v. Doolin* (2009) 45 Cla.4th 390, 421, fn.
22.)

The state appellate court then reviewed and rejected Petitioner's first claim:

Defense counsel requested the following special instruction based on
*People v. Senior* (1992) 3 Cal.App.4th 765, 776: "To be guilty of Count I and
Count II, both alleging sexual penetration by force, fear or threats, the defendant
must possess a certain specific intent at the time of the alleged commission of the
act.  At the time of the alleged act of penetration, *the defendant's specific intent
must be the purpose of sexual arousal, gratification, or abuse.*" (Emphasis
added.)

The trial court agreed with defense counsel that forcible sexual penetration
is a specific intent crime.  However, the court declined to give defendant's
requested instruction because "between [CALCRIM] instructions 252 and 1045,
that, those concepts that he's requesting on the issue of specific intent are
included and discussed."

The court instructed the jury with CALCRIM No. 252, in relevant part, as
follows: "The following crimes require a specific intent or mental state.  And that
would be Counts I and II, which is penetration by force, fear, or violence.  For
you to find a person guilty of this crime as charged in Counts I and II, that person
must not only intentionally commit the prohibited act, but must do so with a
specific intent. *The act and specific intent required are explained in the
instruction for that crime.*" (Emphasis added.)

The court also instructed the jury with CALCRIM No. 1045, in relevant
part, as follows: "The defendant is charged in Counts I and II with sexual
penetration by force, in violation of Penal Code Section 289.  To prove that the
defendant is guilty of this crime, the People have to prove four elements:  [¶] One,
the defendant committed an act of sexual penetration with another person; [¶]
Two, the penetration was accomplished by using a foreign object; [¶] Three, the

United States District Court
Northern District of California

other person did not consent to the act, and [¶] Four, the defendant accomplished the act by force, violence, duress, menace, or fear of immediate and unlawful bodily injury to another person.  [¶] Sexual penetration means penetration, however slight, of the genital or anal opening of the other person *for the purpose* [] of sexual abuse, arousal, or gratification…. *Penetration for sexual abuse means penetration for the purpose* of causing pain, injury, or discomfort."  (Emphasis added.)

Defendant was charged with a violation of section 289, subdivision (a)(1), which provides in pertinent part, "Any person who commits an act of sexual penetration when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person shall be punished by imprisonment…."  Section 289, subdivision (k)(1) defines "'sexual penetration'" as "the act of causing the penetration, however slight, of the genital or anal opening of any person or causing another person to so penetrate the defendant's or another person's genital or anal opening for the purpose of sexual arousal, gratification, or abuse by any foreign object, substance, instrument, or device, or by any unknown object."

Defendant argues the denial of the requested instruction deprived him of his right to present his defense theory that his penetration of Differding's genitals was accidental or that he otherwise did not act with the required specific intent. We disagree.

Pursuant to CALCRIM Nos. 252 and 1045, the trial court properly instructed the jury that sexual penetration is a specific intent crime, meaning that the "person must not only commit the prohibited act, but must do so with a specific intent," (CALCRIM No. 252) and that the nature of that intent would be explained in the instruction on forcible sexual penetration.  Thereafter, the jury was also told that sexual penetration required a finding that defendant had penetrated Differding "*for the purpose of sexual abuse, arousal, or gratification.*" (CALCRIM No. 1045, emphasis added.)  We discern no material difference between committing an act with a specific intent and committing an act for a particular purpose.  Together these instructions sufficiently advised the jury of the specific intent required to be convicted of forcible sexual penetration. Defendant's requested instruction, although legally correct, was duplicative of other instructions, and the trial court had no duty to give it.  (See *People v. Lucas* (2014) 60 Cal.4th 153, 285 ["A court may refuse a proposed instruction if it is duplicative of other instructions."].)

Moreover, both parties clarified the specific intent requirement in closing argument.  The prosecutor argued that defendant's statement to the deputies, "I know it was wrong," was evidence that he intended to abuse Differding.  "And that's our theory of the case: That he was trying to degrade and humiliate her, cause her pain, because he felt that she was unfaithful to him."  The prosecutor continued, "He's so angry with her that morning, he's so angry, because he so believes that she's cheating on him that, when she's crying in the bathroom, because she can't get her keys and she needs to go to work, he comes in, and he assaults her, and he violates her…."

11

In turn, defense counsel argued in closing that the specific intent element had not been proven. Setting aside sexual arousal or gratification as inapplicable to this case, defense counsel focused on the intent to sexually abuse: "Well, what is penetration for sexual abuse? What is that? He has to have specific intent, when he does this thing, penetration for sexual abuse means penetration for the purpose of causing pain, injury, or discomfort. That's the definition in Instruction [CALCRIM No.] 1045. The specific intent that [defendant] would have had to have had is that he performed this penetration for the purpose of causing pain, injury, or discomfort." Based on evidence that defendant had been drinking, defense counsel posited: "What if your sole focus, irrational though it may be, is that you're performing your own exam to prove to this person that you're mad at that she cheated on you? And what if this stupid decision is made because, in part, you're drunk, and you think she's cheating on you, and you want to demonstrate it? So you try to get some evidence of it. And you therefore, because of your concern about her being unfaithful, exam or not, and your level of intoxication, you have not formed the intent to cause pain, injury, or discomfort, in part due to voluntary intoxication." [FN4]

> FN4. Consistent with defendant's theory of the case, the jury was also instructed based on CALCRIM No. 3526, that it could consider defendant's voluntary intoxication in deciding whether he "acted with the intent to do the act required."

Finally, even if we were to agree with defendant that the requested special instruction should have been given, we conclude the error was harmless. Defendant argues we must apply the federal standard of harmless beyond a reasonable doubt in assessing his claim because not giving the requested instruction lightened the prosecution's burden of proving every element of the charged offense beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24) We disagree. If any error occurred, it consisted of failing to give a legally correct but duplicative instruction. Based on the evidence and arguments of counsel in connection with defendant's claim that he lacked the specific intent for forcible sexual penetration, there is no reasonable probability that the jury would have reached a result more favorable to defendant had the trial court given the requested duplicative instruction. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*); see also *People v. Flood* (1998) 18 Cal.4th 470, 490 [applying *Watson* standard to instructional error that does not amount to federal constitutional error].)

Op. at 9-12.

A state trial court's refusal to give an instruction does not alone raise a ground cognizable in a federal habeas corpus proceeding. See <u>Dunckhurst v. Deeds</u>, 859 F.2d 110, 114 (9th Cir. 1988). The error must so infect the trial that the defendant was deprived of the fair trial guaranteed by the Fourteenth Amendment. See <u>id.</u> Also, the omission of an instruction is less

12

United States District Court
Northern District of California

1  likely to be prejudicial than a misstatement of the law.  See Walker v. Endell, 850 F.2d at 475-76

2  (citing Henderson v. Kibbe, 431 U.S. at 155).  Thus, a habeas petitioner whose claim involves a

3  failure to give a particular instruction bears an "'especially heavy burden.'"  Villafuerte v. Stewart,

4  111 F.3d 616, 624 (9th Cir. 1997) (quoting Henderson v. Kibbe, 431 U.S. 145, 155 (1977)).  The

5  significance of the omission of such an instruction may be evaluated by comparison with the

6  instructions that were given.  Murtishaw v. Woodford, 255 F.3d 926, 971 (9th Cir. 2001) (quoting

7  Henderson, 431 U.S. at 156); see id. at 972 (due process violation found in capital case where

8  petitioner demonstrated that application of the wrong statute at his sentencing infected the

9  proceeding with the jury's potential confusion regarding its discretion to impose a life or death

10  sentence).

11       After comparing the omitted instruction with the instructions that were given, id., the Court

12  finds that the state appellate court's rejection of this claim was not unreasonable.  As discussed by

13  the state appellate court, the trial court declined to give Petitioner's requested instruction because

14  CALCRIM Nos. 252 and 1045 already discussed specific intent such that the requested

15  instructions would merely be duplicative.  See supra at 10-11.  CALCRIM No. 252 clearly set

16  forth that Counts I and II require "a specific intent or mental state" which is "penetration by force,

17  fear or violence," and that Petitioner "must not only intentionally commit the prohibited act, but

18  must do so with a specific intent."  Id. at 10.  CALCRIM No. 1045 stated that "[s]exual

19  penetration means penetration, however slight, of the genital or anal opening of the other person

20  for the purpose[] of sexual abuse, arousal, or gratification…. Penetration for sexual abuse means

21  penetration for the purpose of causing pain, injury, or discomfort."  Id.  The state appellate court

22  reasonably concluded that "[t]ogether these instructions sufficiently advised the jury of the

23  specific intent required to be convicted of forcible sexual penetration."  Id. at 11.  Defendant's

24  requested instructions that "At the time of the alleged act of penetration, the defendant's specific

25  intent must be the purpose of sexual arousal, gratification, or abuse," (id. at 10), is merely a re-

26  wording of CALCRIM No. 1045.  Therefore, in the context of the instructions as a whole and the

27  overall charge to the jury, the Court is not persuaded that the failure to give the requested

28  instruction so infected the entire trial that the resulting conviction violates due process.  See

1   Estelle, 502 U.S. at 72; Frady, 456 U.S. at 169.

2          Furthermore, even if it was error to deny the requested instruction, the error did not have a

3   substantial and injurious effect or influence in determining the jury's verdict.  See Brecht, 507

4   U.S. at 637; Calderon, 525 U.S. at 146-47.  The state appellate court reasonably found that the

5   error was harmless when it concluded the following: "Based on the evidence and arguments of

6   counsel in connection with defendant's claim that he lacked the specific intent for forcible sexual

7   penetration, there is no reasonable probability that the jury would have reached a result more

8   favorable to defendant had the trial court given the requested duplicative instruction."  See supra at

9   12.  The Court agrees.  The requested instructions included the following: "At the time of the

10  alleged act of penetration, the defendant's specific intent must be the purpose of sexual arousal,

11  gratification, or abuse."  See supra at 10.  As discussed above, the given instructions stated that

12  specific intent was a necessary requirement, and that the specific intent for forcible sexual

13  penetration means penetration for the purpose of causing pain, injury, or discomfort.  Id. at 13.

14  Because the given instructions and the requested instructions were duplicative, it cannot be said

15  that the jury would have reached a different verdict had they been given the requested instructions

16  as well.  Accordingly, the Court finds that the failure to give the requested instructions did not

17  have a substantial and injurious effect or influence in determining the jury's verdict.  See Brecht,

18  507 U.S. at 637.  Petitioner is not entitled to habeas relief based on harmless error.  See Calderon,

19  525 U.S. at 146-47.

20         Based on the foregoing, the state courts' rejection of this claim was not an unreasonable

21  application of Supreme Court precedent or based on an unreasonable determination of the facts in

22  light of the evidence presented.  28 U.S.C. § 2254(d).  Accordingly, Petitioner is not entitled to

23  habeas relief on this claim.

24                b.      **State Appellate Court's Review of Claim 1 (Claim 2)**

25         Petitioner's second claim is that the appellate court erred in denying his first claim of

26  instructional error because it applied the incorrect standard of review.  Petitioner is entitled to

27  federal habeas relief based on such an error only if it "resulted in a decision that was contrary to,

28  or involved an unreasonable application of, clearly established Federal law, as determined by the

United States District Court
Northern District of California

Supreme Court of the United States." 28 U.S.C. § 2254(a).  As discussed in the previous section, the state appellate court's rejection of Petitioner's first claim was not an unreasonable application of Supreme Court precedent.  Even if the state appellate court applied an incorrect standard of review in rejecting Petitioner's first claim, it did not result in a decision that was contrary to clearly established Federal law because Petitioner's underlying claim had no merit.  Accordingly, there is no merit to this claim, and Petitioner is not entitled to habeas relief thereon.

### c.     **Instruction Defining Sexual Abuse (Claim 3)**

Petitioner's third claim is that the trial court deprived him of due process and a fair trial when it instructed the jury with CALCRIM No. 1045 which provided that sexual abuse under section 289 may be satisfied by the intent to cause mere "discomfort."  (Pet. at 5.)  Petitioner claims that the intent to cause "discomfort" is not sufficient to constitute "abuse" under section 289. (Docket No. 5 at 25.)  The state appellate court reviewed and rejected this claim:

> Defendant contends the trial judge erred by instructing the jury with CALCRIM No. 1045 because it incorrectly defines "[p]enetration for *sexual abuse*" as "penetration for the purpose of causing pain, injury, or *discomfort*." (Emphasis added in second quote.)  Defendant contends the intent to cause "discomfort" is insufficient to constitute "abuse" under section 289, and thus the jury was misinstructed on the specific intent element of this offense.  The error was prejudicial and likely affected the verdict, according to defendant, in light of the weakness of the prosecution evidence that defendant intended to cause Differing significant pain or injury.

> The jury instruction given in this case – CALCRIM No. 1045 – was based on language and analysis in *People v. White* (1986) 179 Cal.App.3d 193 (*White*). In *White*, the defendant was convicted of violating section 289, subdivision (a), forcible penetration of the anus by a foreign object for the purpose of sexual arousal, gratification, or abuse.  At trial, White testified that he became upset when changing the diaper of his girlfriend's 17-month-old daughter.  He claimed he did nothing sexual in angrily spanking her, possibly penetrating her anus.  The prosecutor argued that, even if defendant's testimony were true, his angry penetration of the child's anus constituted sexual abuse under section 289.  (*Id.* at pp. 197, 203-204.)

> The Court of Appeal affirmed, holding that "sexual abuse" under section 289, as distinguished from sexual arousal and sexual gratification, does not require a sexually motivated intent.  (*White*, *supra*, 170 Cal.App.3d at pp. 204-206.)  Rather, the court found that sexual abuse applies more broadly to conduct involving a victim's "sexual or 'private' parts" where the intent is "'in fact to "abuse," i.e., to hurt, cause pain or injure.'"  (*Id.* at pp. 205.)  The court explicitly

United States District Court
Northern District of California

15

agreed with respondent in *White* that "'when a penetration is accomplished for the purpose of causing pain, injury or discomfort, it becomes sexual abuse, even though the perpetrator may not necessarily achieve any sexual arousal or gratification whatsoever.' (Fn. omitted.) [¶] We are persuaded that respondent's view of the law is correct and that it is the only interpretation of 'sexual abuse' that is reasonable." (*Ibid.*)

Defendant argues that, in quoting from respondent's arguments in its opinion, the *White* court intended to agree with the Attorney General that "the 'sexual' character of the abuse comes from the body part involved, not a lewd intent," but did not intend to endorse a broad definition of abuse as encompassing the intent to cause mere "discomfort." Defendant seizes on *White's* use of the phrase "injure or hurt badly" (*White*, *supra*, 170 Cal.App.3d at p. 205) in another part of the opinion to argue that the term "abuse" requires substantial adverse impact on the victim. Defendant also relies on dictionary definitions of the terms "abuse" and "discomfort" to bolster its argument; "abuse" typically means "'to injury, hurt or damage,'" while "discomfort" commonly describes a "'trivial or minor experience of being 'uncomfortable or uneasy.'"

We reject defendant's constricted reading of *White* and his contention that the trial court misinstructed the jury by giving a legally incorrect statement of the specific intent required by section 289. *White's* definition of sexual abuse to include causing "discomfort" (*White*, *supra*, 179 Cal.App.3d at p. 205) was incorporated into CALJIC No, 10.30 [FN5] shortly after *White* was decided, and thereafter into CALCRIM No. 1045. Defendant has brought to our attention no case law criticizing *White* or either form instruction on this point since *White* was decided 29 years ago. Moreover, "discomfort," commonly defined as "an uncomfortable or painful feeling in the body," is not necessarily trivial or minor. (http://www/Merriam-Webster.com/dictionary/discomfort.) Nor are dictionary definitions of abuse limited to acts that cause injury or substantial pain. The common definitions of abuse include "to put to a bad use," "take unfair or undue advantage of," "to use or treat so as to injure, hurt, or damage," "maltreat," and "treat in a harsh or harmful way." (Webster's 3d New Internat. Dict. (2002) p. 8; http:///www.Merriam-Webster.com/dictionary/abuse.)

> FN5. CALJIC No. 10.30 provides, in pertinent part: "The 'specific intent to cause sexual abuse,' as used in this instruction, means a purpose to injure, hurt, cause pain or cause discomfort.

Dictionary definitions aside, in our view, the term "[p]enetration for *sexual abuse*" as defined in CALCRIM No. 1045 appropriately includes the "purpose of causing… discomfort" in addition to the purpose of causing pain or the purpose of causing injury. In *White*, the court distinguished sexual penetration that would not violate the statute because it was done for a permissible purpose and not to arouse, gratify or abuse, such as "insertion of a thermometer or a suppository or other medicine." (*White*, *supra*, 179 Cal.App.3d at p. 205.) The range of such permissible purposes for sexual penetration would seem to narrow. We decline to read "[p]enetration for *sexual abuse*" under *White* or section 289 as

requiring a heightened intent to cause substantial harm to the victim in the form of pain or injury.

In any event, any instructional error was harmless under any standard. (*Chapman v. California, supra*, 386 U.S. 18; *People v. Watson, supra*, 46 Cal.2d at p. 836.)  Differing testified that when defendant put his fingers inside her vagina, he seemed to reach all the way up to her stomach and that her pain was "so bad."  Differing felt pain in her vagina for a week after the incident, and it "hurt to go to the bathroom."  We find the evidence was overwhelming in support of the jury's finding of "penetration for the purpose of causing pain [or] injury" (CALCRIM No. 1045), and not merely "discomfort."  Under any reasonable definition of abuse, defendant's conduct was abusive.

Op. at 12-15.

In rejecting Petitioner's claim, the state appellate court rejected his reading of section 289 and the state case law of People v. White, 179 Cal.App.3d 193.  A state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.  Bradshaw v. Richey, 546 U.S. 74, 76 (2005); Hicks v. Feiock, 485 U.S. 624, 629 (1988).  The state's highest court is the final authority on the law of that state. Sandstrom v. Montana, 442 U.S. 510, 516-17 (1979).  Even a determination of state law made by an intermediate appellate court must be followed and may not be "'disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.'"  Hicks, 485 U.S. at 630 n.3 (quoting West v. American Telephone & Telegraph Co., 311 U.S. 223, 237-38 (1940)).  Here, the state supreme court summarily denied review, indicating no disagreement with the state appellate court's ruling.  Accordingly, we are bound by the state appellate court's interpretation of state law.  Id.  And to the extent that Petitioner is challenging the state appellate court's interpretation of state law, the Supreme Court has repeatedly held that federal habeas writ is unavailable for violations of state law or for alleged error in the interpretation or application thereof.  See Swarthout v. Cooke, 131 S. Ct. 859, 861-62 (2011); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Engle v. Isaac, 456 U.S. 107, 119 (1982); Peltier v. Wright, 15 F.3d 860, 861-62 (9th Cir. 1994); see, e.g., Little v. Crawford, 449 F.3d 1075, 1082 (9th Cir. 2006) (claim that state supreme court misapplied state law or departed from its earlier decisions does not provide a ground for habeas relief).

Even if we assume there was an unconstitutional error, the Court agrees with the state

1    appellate court that any such error was harmless.  According to the victim's testimony, Petitioner

2    "reached inside her shorts and 'shov[ed]' his fingers so far into her vagina that it 'felt like [they]

3    were] in [her] stomach,'" and "[s]he could tell it was more than one finger '[b]ecause it hurt so

4    bad.'"  See supra at 3.  The victim also testified that she had pain in her vagina for about a week,

5    and that it hurt to go the bathroom.  Id.  Accordingly, even if the ailing instructions had not

6    included "discomfort," there was certainly sufficient evidence to support the jury's finding "of

7    'penetration for the purpose of causing pain [or] injury' (CALCRIM No. 1045)."  See supra at 17.

8    Therefore, it cannot be said that the ailing instruction had a substantial and injurious effect or

9    influence in determining the jury's verdict.  See Brecht, 507 U.S. at 637.  The state courts'

10    rejection of this claim was not an unreasonable application of Supreme Court precedent or based

11    on an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. §

12    2254(d).  Accordingly, Petitioner is not entitled to habeas relief on this claim.

13    　　　　　　　　　d.    **Instruction on Flight (Claim 4)**

14    　　　　Petitioner's fourth claim is that CALCRIM No. 372 is "argumentative under the standard

15    defined by this Court in "Wright," and giving it deprived [him] of due process."  (Pet. at 5.)  The

16    state appellate court reviewed and rejected this claim:

17
18    　　　　　　Defendant argues his convictions must be reversed because the trial judge
      gave a jury instruction regarding evidence of flight that was argumentative and
19    favored the prosecution.  Defendant contends the instruction invited the jury to
      consider whether evidence of flight reflected consciousness of guilt, but without
20    reference to defendant's possible innocence.  Defendant contends the instruction
      lightened the prosecution's burden of proving each element of each offense
21    beyond a reasonable doubt, and thus violated his right to a fair trial.  This
      argument is meritless.

22
23    　　　　　　Section 1127c provides: "In any criminal trial or proceeding where
      evidence of flight of a defendant is relied upon as tending to show guilt, the court
24    shall instruct the jury substantially as follows: [¶] The flight of a person
      immediately after the commission of a crime, or after he is accused of a crime that
25    has been committed, is not sufficient in itself to establish his guilt, but is a fact
      which, if proved, the jury may consider in deciding his guilt or innocence.  The
26    weight to which such circumstance is entitled is a matter for the jury to determine.
      [¶]  No further instruction on the subject of flight need be given."

27
      　　　　　　The jury instruction at issue – CALCRIM No. 372 – is based on section
28    1127c.  The trial court instructed the jury as follows:  "If the defendant fled or

United States District Court
Northern District of California

tried to flee immediately after the crime was committed, that conduct may show that he was aware of his guilt.  If you conclude that the defendant fled or tried to flee, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled or tried to flee cannot prove guilt by itself."

A trial court must refuse an argumentative jury instruction.  (*People v. Mincey* (1992) 2 Cal.4th 408, 437.)  "A jury instruction is argumentative when it is '"of such a character as to invite the jury to draw inferences favorable to one of the parties from specified items of evidence." [Citations.]' [Citation.]" (*People v. Lewis* (2001) 26 Cal.4th 334, 380.)

Appellate courts have upheld the constitutionality of CALCRIM No. 372, finding it an unbiased statement of the law that does not unduly favor the prosecution.  (*People v. Paysinger* (2009) 174 Cal.App.4th 26 (*Paysinger*); *People v. Rios* (2007) 151 Cal.App.4th 1154 (*Rios*).)  In both *Paysinger* and *Rios*, the defendants claimed that CALCRIM No. 372 presumed the defendant's guilt, lowered the prosecution's burden of proof, and deprived the defendant of a jury verdict.  In rejecting the contention that CALCRIM No. 372 impermissibly invites the jury to infer guilt, the *Paysinger* court explained: "It has long been accepted that if flight is significant at all, it is significant because it may reflect consciousness of guilt, which in turn tends to support a finding of guilt. [Citation.] That CALCRIM No. 372 tells the jury this does not in any way make the instructions unconstitutional." (*Paysinger*, *supra*, 174 Cal.App.4th at pp. 31-32.) The *Rios* court relied on California Supreme Court precedent upholding the constitutionality of section 1127c and the predecessor flight instruction, CALJIC No. 2.52.  [FN6]  (*Rios*, *supra*, 151 Cal.App.4th at pp. 1158-1159; see *People v. Navarette* (2003) 30 Cal.4th 458, 502; *People v. Mendoza* (2000) 24 Cal.4th 130, 179.)  Our Supreme Court has repeatedly rejected similar challenges to CALJIC No. 2.52.  (See, e.g., *People v Boyce* (2014) 59 Cal.4th 672, 691, and cases cited therein.)  The court's reasoning in these cases applies equally to this challenge to CALCRIM No. 372.

FN6. CALJIC No. 2.52 provides: "The [flight] [attempted flight] [escape] [attempted escape] [from custody] of a person [immediately] after the commission of a crime, or after [he] [she] is accused of a crime, is not sufficient in itself to establish [his] [her] guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding whether a defendant is guilty or not guilty.  The weight to which this circumstance is entitled is a matter for you to decide."

Defendant's argument focuses entirely on the deficiencies in the first sentence of CALCRIM No. 372, but the propriety of jury instructions is determined from "'the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.'" (*People v. Jeffries* (2000) 83 Cal.App.4th 15, 22.)  The first sentence of the instruction refers to an inference that flight "may show" that the defendant was "aware of his guilt."  However, the instruction does not presume a defendant's guilt.  Nor does it require the jury to find that a defendant in fact fled the scene or direct that a particular inference be

drawn.  Rather, the instruction is phrased in permissive and conditional, not mandatory terms, such as "[i]f the defendant fled," "[i]f you conclude," and "it is up to you to decide…."  (CALCRIM No. 372.)  The instruction informed the jury that it could consider evidence of flight along with all the other evidence, and should give the evidence whatever meaning and weight the jury deemed appropriate.  (See *People v. Carter*, (2005) 36 Cal.4th 1114, 1182-1183.)  The instruction also emphasized that evidence of flight was not alone sufficient to establish guilt: "The cautionary nature of the [flight] instruction[] benefits the defense, admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory."  (*People v. Jackson* (1996) 13 Cal.4th 1164, 1224.)

The trial court also gave standard instructions on the presumption of innocence, direct and circumstantial evidence, the prosecution's burden of proof, and the standard of proof beyond a reasonable doubt, in addition to CALCRIM No. 200, which cautioned the jurors: "Pay careful attention to all of these instructions and consider them together…. [¶]…[¶]… Do not assume just because I give a particular instruction that I am suggesting anything about the facts." These instructions ensured that the flight instruction did not undermine the presumption of innocence or lower the prosecution's burden to prove each element of each offense beyond a reasonable doubt.

Defendant attempts to distinguish CALCRIM No. 372 from CALJIC No. 2.52 on the basis that, in only identifying the inference favorable to the prosecution, CALCRIM No. 372 strays too far from the language of section 1127c.  Defendant contends CALJIC No. 2.52 is unobjectionable because it refers to flight as evidence that a jury could consider in deciding "guilty or not guilty." We disagree.  There is no material difference between CALJIC No. 2.52 and CALCRIM No. 372.  Both instructions identify the permissible inference that could be drawn if the jury were to find the defendant fled the scene, inform the jury that the meaning and weight to accord the evidence of flight is for the jury to decide; and make clear that evidence of flight without more is insufficient to establish a defendant's guilt.  The flight instruction given in this case was not argumentative.

Op. at 15-18.

The state court's rejection of this claim was not unreasonable.  In order to show a due process violation, the defendant must show both ambiguity and a "reasonable likelihood" that the jury applied the instruction in a way that violates the Constitution, such as relieving the state of its burden of proving every element beyond a reasonable doubt.  <u>Waddington v. Sarausad</u>, 555 U.S. 179, 190-191 (2009) (internal quotations and citations omitted).  A "meager 'possibility'" that the jury misapplied the instruction is not enough.  <u>Kansas v. Carr</u>, 136 S. Ct. 633, 643 (2016) (quoting <u>Boyde</u>, 494 U.S. at 380).  Such is the case here, where taking the instructions as a whole, there is

no reasonable likelihood that the jury would have applied the instructions regarding flight in a manner that favored the prosecution. As the state appellate court pointed out, CALCRIM No. 372 was phrased "in permissive and conditional, not mandatory terms": "*If you conclude that the defendant fled or tried to flee, it is up to you* to decide the meaning and importance of that conduct." See supra at 18 (emphasis added). Furthermore, the instructions also clearly stated that "evidence that the defendant fled or tried to flee cannot prove guilt by itself." Id. Considering the "flight" instructions in the context of the overall charge to the jury, which including instructions on the presumption of innocence, direct and circumstantial evidence, the prosecution's burden of proof, and the standard of proof beyond a reasonable doubt, "in addition to CALCRIM No. 200, which cautioned the jurors: 'Pay careful attention to all of these instructions and consider them together,'" see supra at 20, the Court is not convinced CALCRIM No. 372 so infected the entire trial that the resulting conviction violates due process. See Estelle, 502 U.S. at 72, 78; Frady, 456 U.S. at 169. The state courts' rejection of this claim was not an unreasonable application of Supreme Court precedent or based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d). Accordingly, Petitioner is not entitled to habeas relief on this claim.

### e.   Cumulative Error (Claim 5)

Petitioner claims that the cumulative prejudice of the above instructional errors (Claims 1 through 4) entitles him to relief. (Pet. at 5.) The state appellate court rejected this claim of cumulative error: "We have rejected each claim of instructional error and found them harmless when considered separately. Considered together, we find no prejudice and reject the claim. (*People v. Bolden* (2002) 29 Cal.4th 515, 567-568.)." Op. at 18.

It has been held that in some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned. See Alcala v. Woodford, 334 F.3d 862, 893-95 (9th Cir. 2003) (reversing conviction where multiple constitutional errors hindered defendant's efforts to challenge every important element of proof offered by prosecution). Where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation. See

United States District Court
Northern District of California

1  Hayes v. Ayers, 632 F.3d 500, 524 (9th Cir. 2011); Mancuso v. Olivarez, 292 F.3d 939, 957 (9th

2  Cir. 2002); Fuller v. Roe, 182 F.3d 699, 704 (9th Cir. 1999); Rupe v. Wood, 93 F.3d 1434, 1445

3  (9th Cir. 1996).

4       The Court has found that none of the above claims of instructional error have merit.  See

5  supra at 14-15, 18.  Accordingly, Petitioner has failed to show cumulative prejudice to warrant

6  federal habeas relief.  See Hayes, 632 F.3d at 524.  The state court's rejection of this claim was not

7  an unreasonable application of Supreme Court precedent or based on an unreasonable

8  determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d).  Accordingly,

9  Petitioner is not entitled to habeas relief on this claim.

10      **2.**    **Insufficient Evidence (Claim 6)**

11       Petitioner's last claim is that there was insufficient evidence to support the conviction for

12  felony false imprisonment.  (Pet. at 6.)  The state appellate court rejected this claim:

13          Defendant contends the evidence is insufficient to sustain his conviction of

14  false imprisonment because there was no evidence that Differding was prevented
   from leaving the bathroom.  We disagree.

15

16          We view the record in the light most favorable to the judgment to
   determine whether it contains evidence that is reasonable, credible, and of solid

17  value such that a reasonable trier of fact could find the defendant guilty beyond a
   reasonable doubt.  (*People v. Osband* (1996) 13 Cal.4th 622, 690.)  We presume

18  in support of the judgment the existence of every fact the trier of fact could
   reasonably deduce from the evidence.  (*Id.* at p. 690.)  We do not reweigh the

19  evidence or reevaluate the credibility of witnesses.  (*People v. Jennings* (2010) 50
   Cal.4th 616, 638.)  If the circumstances reasonably justify the trier of fact's

20  findings, reversal is not warranted merely because the circumstances might also
   reasonably justify a contrary finding.  (*Id.* at p. 639.)

21

22          "False imprisonment is the unlawful violation of the personal liberty of
   another."  (§ 236.)  "[T]he essential element of false imprisonment is restraint of

23  the person.  Any exercise of express or implied force which compels another
   person to remain where he does not wish to remain, or to go where he does not

24  wish to go, is false imprisonment.  (*People v. Fernandez* (1994) 26 Cal.App.4th
   710, 717.)"  (*People v. Bamba* (1997) 58 Cal.App.4th 1113, 1123.)  "'"The wrong

25  may be committed by acts or words, or both, and by merely operating upon the
   will of the individual or by personal violence, or both....'"'"  (*People v.*

26  *Fernandez, supra,* 26 Cal.App.4th at p. 717.)  "False imprisonment is a felony if it
   is effected by violence or menace.  (§ 237.)"  (*People v. Bamba, supra,* 58

27  Cal.App.4th at p. 1123; *People v. Dominguez* (2010) 180 Cal.App.4th 1351,

28  1360.)

                    United States District Court
                    Northern District of California

1
2
3
4
5
6
7

        Here, there is substantial evidence that defendant's conduct in pinning
Differding down on the floor and against the wall in the bathroom compelled her
to remain where she did not wish to remain.  Defendant followed Differding into
the bathroom shouting obscenities at her, pushed her to the floor, and slapped her
face several times.  Differding struggled and screamed at him to stop, but he lay
on top of her, pinning her down.  When she was able to get up, defendant pushed
her into the bathtub and then pinned her against the wall with a forearm across her
throat.  Differding resisted him, screaming, "Stop, stop, stop, stop."  Eventually,
defendant lowered his arm and stood in the bathroom panting.  Differding left the
bathroom, found her keys and phone, and left the house.  This is sufficient
evidence that defendant made Differding stay in the bathroom against her will.

8
9
10
11
12
13
14
15
16

        Defendant argues that Differding voluntarily entered the bathroom and
never testified that she was unable to leave the bathroom or even that she wished
to do so.  Defendant acknowledges Differding's testimony that she struggled
against defendant as he pinned her down twice and forcibly penetrated her vagina
twice, but contends that she "would not have exited the bathroom even absent that
restraint."  The argument is meritless.  It is apparently based on Differding's
testimony that when defendant finally stopped struggling with her and stood there
panting, she remained on the bathroom floor, "like I was trying to protect myself,
if he was going to come at me again," before she left the bathroom.  It makes no
difference that Differding went into the bathroom of her own volition.  Nor does it
matter that Differding briefly remained in the bathroom after defendant let go of
her throat.  The circumstances reasonably justify the jury's finding that Differding
did not remain in the bathroom by choice after defendant came in yelling and
physically abusing her.  (See *People v. Dominguez* (1997) 38 Cal.App.4th 410,
421.)

17

Op. at 18-20.

18

        The Due Process Clause "protects the accused against conviction except upon proof

19

beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

20

charged."  In re Winship, 397 U.S. 358, 364 (1970).  The Supreme Court has emphasized that

21

sufficiency of the evidence types of "claims face a high bar in federal habeas proceedings . . ."

22

Coleman v. Johnson, 132 S. Ct. 2060, 2062 (2012) (per curiam) (finding that the Third Circuit

23

"unduly impinged on the jury's role as factfinder" and failed to apply the deferential standard of

24

Jackson [v. Virginia, 443 U.S. 307, 321 (1979)] when it engaged in "fine-grained factual parsing"

25

to find that the evidence was insufficient to support petitioner's conviction).  A federal court

26

reviewing collaterally a state court conviction does not determine whether it is satisfied that the

27

evidence established guilt beyond a reasonable doubt.  Payne v. Borg, 982 F.2d 335, 338 (9th Cir.

28

1992); see, e.g., Coleman, 132 S. Ct. at 2065 ("the only question under Jackson is whether [the

jury's finding of guilt] was so insupportable as to fall below the threshold of bare rationality"). The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Payne, 982 F.2d at 338 (quoting Jackson, 443 U.S. at 319). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, has there been a due process violation. Jackson, 443 U.S. at 324.

Viewing the evidence in the light most favorable to the prosecution, the Court finds that any rational trier of fact could have found the essential elements for felony false imprisonment beyond a reasonable doubt. Payne, 982 F.2d at 338. In California, the "essential element" of false imprisonment is "restraint of the person" and "[a]ny exercise of express or implied force which compels another person to remain where he does not wish to remain... is false imprisonment," which is a felony if effected by violence or menace. See supra at 22. The victim's testimony clearly supports the conclusion that she was "restrained" and violently so: after the victim entered the bathroom, Petitioner followed her, screaming insults at her; Petitioner slapped her face repeatedly and pushed her to the floor; the victim struggled and screamed at him to stop, but he lay on top of her and pinned her down; when the victim was eventually able to get up, Petitioner pushed her again, causing her to fall into the bathtub; when she struggled to stand up, Petitioner pinned her against the wall with a forearm across her throat; the victim resisted him, screaming, "Stop, stop, stop, stop"; Petitioner finally stopped, lowered his arm and stood in the bathroom panting while standing over the victim; only then did the victim leave the bathroom, find her keys and phone, and leave the house. See supra at 2-3. This is sufficient evidence that Petitioner made the victim stay in the bathroom against her will using violence. Petitioner has failed to show that no rational trier of fact could have found proof of guilt beyond a reasonable doubt based on this evidence. Jackson, 443 U.S. at 324. The state court's rejection of this claim was not an unreasonable application of Supreme Court precedent or based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d). Accordingly, Petitioner is not entitled to habeas relief on this claim.

///

24

## IV.  CONCLUSION

After a careful review of the record and pertinent law, the Court concludes that the Petition for a Writ of Habeas Corpus must be **DENIED**.

Further, a Certificate of Appealability is **DENIED**.  See Rule 11(a) of the Rules Governing Section 2254 Cases.  Petitioner has not made "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Nor has Petitioner demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).  Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a certificate from the Court of Appeals under Rule 22 of the Federal Rules of Appellate Procedure.  See Rule 11(a) of the Rules Governing Section 2254 Cases.

The Clerk shall terminate any pending motions, enter judgment in favor of Respondent, and close the file.

**IT IS SO ORDERED**.

Dated:   8/15/2016

EDWARD J. DAVILA
United States District Judge

P:\PRO-SE\EJD\HC.15\02238Ortiz-Calderon_denyHC